STATE OF CONNECTICUT *v.* FERNANDO R.[1]
(AC 26516)

Schaller, Rogers and West, Js.

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Argued January 5—officially released September 18, 2007

*John R. Gulash, Jr.,* for the appellant (defendant).

*Denise B. Smoker,* senior assistant state's attorney, with whom, on the brief, were *David I. Cohen,* state's attorney, and *Paul J. Ferencek,* senior assistant state's attorney, for the appellee (state).

*Opinion*

WEST, J. The defendant, Fernando R., appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2) and risk of injury to a child in violation of General Statutes § 53-21 (a) (2). On appeal, the defendant claims that the trial court improperly (1) limited his cross-examination of a witness concerning bias and interest in violation of his sixth amendment right to confront witnesses[2] and (2) denied his motion to suppress. We agree with the defendant's first claim and therefore reverse the judgment of the trial court.

[2] The sixth amendment to the United States constitution provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

The defendant's ten year old cousin, the victim, suffered a laceration to her hymen on August 21, 2003. According to the victim, the defendant touched her vagina, and she then felt something poke and scratch her. The defendant, who was seventeen years old and lived in the same home as the victim, denied touching her and instead suggested that she could have injured herself by masturbating while she was wearing false fingernails.

The defendant was arrested and charged with sexual assault in the first degree and risk of injury to a child. At trial, the victim testified that the defendant had injured her, and the defendant testified that he had not done so. The victim's mother, to whom the victim first reported the injury, corroborated her testimony. Several other relatives of the victim and the defendant, however, testified that the victim and her mother had reputations for untruthfulness. The physician who examined the victim after her injury testified that it was possible but not reasonably probable that she could have injured herself. According to that physician, a ten year old girl ordinarily would not masturbate in such a way as to tear her hymen because to do so would be painful.

After considering the evidence, the jury returned a verdict of guilty on both counts. The court rendered judgment in accordance with the verdict and sentenced the defendant to a total effective term of twenty-five years incarceration, execution suspended after twelve years, followed by thirty-five years probation. This appeal followed.

I

The defendant first claims that the court improperly limited the cross-examination of a prosecution witness concerning bias and interest in violation of his sixth amendment right to confront witnesses as to two matters. The first matter concerned an investigation of the

victim's mother by the department of children and families (department).[3] Witnesses who testified on behalf of the defendant testified that the victim initially told her mother that she had injured herself, but the mother later blamed the defendant in order to deflect attention from her possible role in causing or failing to prevent the victim's injury. The second matter concerned the decision of the mother to contribute $4000 toward the defendant's bond one day after his arrest. The defendant argued that the contribution indicated that the mother initially believed that the victim had injured herself, but the mother later blamed the defendant because his father failed to fulfill his promise to reimburse her for contributing to the posting of the defendant's bond. The court precluded the defendant from cross-examining the mother as to both matters because it determined that they were collateral and irrelevant and would confuse the jury. We agree with the defendant that the court's rulings with regard to both matters were improper.[4]

---

[3] The record is unclear as to the nature of the department's investigation of the victim's mother, but it appears that the department conducted at least a limited inquiry of the living arrangements after the August 21, 2003 incident.

[4] It bears noting that the court also failed to instruct the jury that the testimony of the victim's mother was limited by the constancy of accusation doctrine. The court instructed the jury on that doctrine only as to the testimony of a police officer who had interviewed the victim. Our Supreme Court has explained that "[t]he constancy of accusation doctrine is well established in Connecticut . . . . Until [*State* v. *Troupe*, 237 Conn. 284, 677 A.2d 917 (1996)], we permitted witnesses to testify about the details of a victim's accounts of [an] alleged sexual assault on the theory that, if the victim's story were true, the evidence would show constancy in the charge even to the details, and the truth would the more clearly appear. . . . In [*Troupe*], however, we restricted the doctrine so that a constancy of accusation witness could testify only to the fact and the timing of the victim's complaint. Even so limited, the evidence would be admissible solely for corroboration of the victim's testimony, and not for substantive purposes." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 272 Conn. 515, 526, 864 A.2d 847 (2005); see also Conn. Code Evid. § 6-11 (c).

In the present appeal, the defendant explicitly declines to claim that the court improperly instructed the jury. The defendant instead focuses on the court's decision to preclude him from cross-examining the mother as to the

We begin by noting the scope of the rulings under review. During cross-examination, the defendant questioned the victim's mother about whether she had told any of her family members that the victim had initially told her that the victim had hurt herself. The state objected to this line of questioning. After a brief sidebar in which the defendant explained that the question was designed to impeach the mother's credibility, the court permitted the defendant to continue questioning the mother. When the defendant repeated a question that already had been asked and answered, the state objected again.[5] The court dismissed the jury at this

department's investigation of her and her contribution to the posting of his bond. Those two matters for cross-examination concerned whether the victim reported to her mother a sexual assault by the defendant or instead reported that she had injured herself. Any testimony of the mother as to the details of the alleged assault is not relevant to our consideration of the limits that the court placed on her cross-examination. Furthermore, the state suggests that the testimony of the mother was admissible for substantive purposes under the excited utterance exception to the rule against hearsay. See *State* v. *Kelly*, 256 Conn. 23, 40–43, 770 A.2d 908 (2001).

[5] The following transcript excerpt from the defendant's cross-examination of the victim's mother provides context for our discussion of his claim:

"Q. Have you ever told any other of your family members that [the victim] said that she hurt herself first and then she said that [the defendant] hurt her?

"A. . . . No. . . .

"Q. In that conversation with [your aunt], didn't you tell her that [the victim] first said she hurt herself and then said [the defendant] hurt her?

"A. . . . No. Never.

"Q. Did you ever express to anyone doubt in [the victim's] recitation of the events?

"[The Prosecutor]: Objection.

"The Court: Sustained.

"Q. You didn't call the police, isn't that correct?

"A. . . . No.

"Q. You took the child to the hospital?

"A. . . . Yes.

"Q. The hospital called the police?

"A. . . . Yes.

"Q. Then, you basically were overseen by social workers from [the department], is that correct?

"A. . . . Yes.

"Q. Did you ever indicate to [your aunt] in a conversation that you were unable to express an alternative story because you would be subject to

point and requested an offer of proof from the defendant.

The defendant made an offer of proof.[6] The state again objected to the form and the content of the question and argued that it was triple hearsay and irrelevant.[7]

arrest? The alternative story being that first, [the victim] said she hurt herself and then she said—

"[The Prosecutor]: Objection."

[6] The following transcript excerpt provides the defendant's offer of proof:

"[Defense Counsel]: At least two family members, in conversations with the witness, have said that [the victim's mother] said that the child first said that she hurt herself and then changed to that [the defendant] hurt her. . . . Yes.

"The Court: Okay. All right. . . . So, family members said that [the victim's mother] first said that [the victim] said it. Go ahead.

"[Defense Counsel]: And she expressed to them that she is afraid to tell them that now because she would be subject to arrest.

"The Court: Okay. So, your question is going to be—your first question is going to lie as it is: did you ever tell family members that [your daughter] said that you said that [your daughter] said the following; is that right?

"[Defense Counsel]: Yes. . . ."

[7] The following is the state's objection to this line of inquiry:

"[The Prosecutor]: I think both the form and the content of the question are inadmissible. First of all . . . it elicits at least triple hearsay. Second of all, I don't see how any of that is relevant. As I understand it, it is designed to show that this witness is making up her story. I mean, I just don't see the relevance of whatever [the victim] told [her mother]. It doesn't seem to be germane to anything here at all. She has related what [the victim] told her. She was not present. Whatever reason she has for not speaking to [the department] . . . does not impeach her credibility or [the victim's]. And I just think it is so unreliable and it elicits such hearsay evidence because, essentially, what the jury is going to hear is what [the victim] told her. And that is hearsay. That is the foundation of the inquiry. [The victim] first told her that she hurt herself. And then [the victim] told her, made up a story, in her belief she made up the story about [the defendant]. And then the jury is going to hear that this witness apparently told some relative that she doesn't want to tell this to the [department] because she is afraid they are going to take her child away from her. It has no relevancy to the issue at hand. It is completely unreliable.

"[Defense Counsel]: Let me add . . . [t]his lady, the next morning, contributed $4000 in a pool with the family members, to bond out my client, who supposedly assaulted her daughter. Now, she had to have some misgivings about the truth of this allegation. Now, we all know and we all admire [the department] for the work that they do. They are very zealous in what they do, and we have a woman who is illiterate in both English and Spanish. . . .

[S]he was threatened with the fact . . . that this wasn't an appropriate

living arrangement for all of these children. If that was her concern, and she makes that recitation, I ask her if the original recitation was the child hurt herself and then she changed it. She says no, I think I have a right to impeach her with the idea that these forces were in place coupled with the fact that she, I mean, she contributed $4000 . . . to get the man out of jail, who supposedly assaulted her daughter. . . .

"[The Prosecutor]: Your Honor, her misgivings about the truth of [the victim's] allegation has nothing to do with this case. That is for the jury to decide. . . . She has simply related what [the victim] told her.

"The Court: That is the problem I am having. When she came into the room and you went out to the bathroom with her, didn't she first say, I hurt myself, and then later, [the defendant] hurt her? No. Did you tell any family members otherwise? No. I mean, that is the end of the line of questioning. I don't see where we are going with any further questioning on this. It is a question of what this girl said. And you have already had an ability to examine her. You asked her what this young girl said to her and what she might have said to other family members. And she said, no, I didn't say anything to any other family members. So, where are we going with it? If we are going to sit here and beat this to death, she has given you an answer.

"[Defense Counsel]: If the . . . primary witness here, the first which is the strength of the state's case because of the immediacy of the report.

"The Court: Right.

"[Defense Counsel]: If there was something other than that, if it wasn't [the defendant] hurt me, it was: ma, I hurt myself, some discussions, whatever. And then it became [the defendant] hurt me. I think that the fact that it wasn't so immediate, the immediacy of the reporting, the accuracy of the first report, I should have an opportunity to inquire into it.

"[The Prosecutor]: Your Honor, while the jury is out, I object to any questions which are designed, as this one is, to determine whether she actually believed [the victim] or if she had any underlying reason to doubt [the victim] because it has no relevance whatsoever. She was not present when this happened. She wasn't there. She didn't see it. Whether she believes [the victim] or not, doesn't make a bit of difference.

"The Court: That is right. It is the ultimate trier who makes that determination, not whether she believes her or not. She is a fact witness. She is going to report what she is going to report, what the girl said to her; what she said to the police; what she said is fine. Did you say anything inconsistent with what you have testified here to? No, I did not. That is the end of it. What you are trying to do is characterize [the victim's] reporting to her by way of her characterizing it otherwise to other people. And that to me is just too far removed.

"[Defense Counsel]: Will the court allow the inquiry as to her posting bond . . . .

"[The Prosecutor]: What is the relevance? That is what I would like to know. . . .

"[Defense Counsel]: She never expected him to be arrested because she didn't believe it happened. I am just trying to make my explanation, Your Honor. She didn't call the police. She took the kid to the hospital. . . . [A]ccept my premise that she wasn't entirely sure that this kid, [who] she

The court ruled that cross-examination regarding the department's investigation and the mother's contribution to the defendant's bond were collateral and irrelevant.[8] The defendant objected again in order to preserve

has trusted all forever, all of a sudden, out of nowhere, this occurs. Okay? And so she has misgivings about this. This takes—well, I will do what I have to do as far as the medical care and then I will deal with this. She is not familiar with the system, the mechanism of the system takes over. Now—

"The Court: You are dealing with mandatory reporters, so mandatory reporters call the cops.

"[Defense Counsel]: So, the next thing you know, this kid gets arrested. The next morning, she is going to join with other family members in pooling? And that is a pretty significant amount of money to be, you know—maybe a few days later there would be righteous indignation, it drops away or whatever, it is all family, maybe we could straighten this out. But the very next morning, she gives $4000 to help get the guy out who just molested her daughter? I think that is pretty significant . . . .

"The Court: You are using that collateral issue to characterize the reporting of the child here. You ought to use that issue to indicate to the trier of fact that she has a problem with what the child reported to her. There may be many motivations for her joining with other family members in posting a bond, many motivations. And it is a collateral issue that, what you are trying to do, I think, is introduce that collateral issue to raise inferences in the minds of the trier that shouldn't be here.

"[Defense Counsel]: With all due respect to the court, Your Honor, if the outcry witness, the mother of the victim has misgivings about the truth of this allegation, which I believe that by posting $4000 the next day indicates, I think that is something the jury should know and take into consideration as, all right, the kid said this, okay. . . .

"The Court: That sounds like an Augustinian great leap of faith. That is how I would characterize what you have just said. Now, I may be wrong. What is your position on it?

"[The Prosecutor]: I object . . . it has no relevancy. It is just designed, as the other question was, to show the jury that this witness may very well have misgivings about her daughter's allegation. And that issue, that whole question has no relevancy here. It is the jury's role to determine the credibility of the victim. So, that whole line of questions regarding what she thought of her daughter's allegation, I would object to it."

[8] The following is an excerpt from the transcript of the court's ruling on these issues:

"The Court: What she is going to report to you is factually what happened and what she did. Whether or not they believe the young woman's testimony here, whether or not they believe that the young woman said the following to her mother, to this witness, that is up to them. The ultimate credibility, the weight they give her testimony, is simply up to them. But I am not going to let you characterize her reporting on an issue relating to the posting of a bond the next day because I think it is a collateral issue that is intended

to really confuse the jury. And I don't really see that it has any relevance here. So, I am not going to allow you to do it. . . .

"[Defense Counsel]: The recitation of events by this witness I have a right to challenge. I have a right to ask her what, if I believe them to be true, what motives she may have had to exaggerate the charges, exaggerate the allegations, exaggerate her recitation of events, conveniently leave out portions of the recitation of events because she is fearful some governmental agency might take some action. I don't think that is uncommon in the area of impeachment of inquiry as it relates to impeachment.

"[The Prosecutor]: There is absolutely no foundation for the question . . . [a]nd . . . there have been no inconsistencies elicited. . . . There is no factual predicate for these questions, and they are prejudicial by their very nature. And they are misleading.

"The Court: I would agree. . . .

"[Defense Counsel]: All I need is a good faith basis for these, as an officer of the court, to ask these questions. I am not attempting to dream up something here that I haven't heard through my investigation of this case. . . .

"[The Prosecutor]: . . . I agree with counsel, right, he only has to show a good faith basis for asking these questions about a motive to fabricate or a motive to align herself with [the victim], when originally she may have doubted her. There is absolutely no showing of that from this witness. But I think if counsel wants to explore that, he better be prepared to call somebody from [the department] to testify about the family situation, what their motives were. And he can't do that because I have spoken to [the department] and, as a matter of fact, given the question that was already asked, I may very well call them and ask them about what was their determination regarding the family situation. It has already been implanted in their minds now that there might be some [department] involvement. These questions are so prejudicial and they just open up a whole Pandora's box where the state now has to call other witnesses and put on other testimony. And then the jury is lost . . . in all of these collateral issues, which really have nothing to do with [the victim's] credibility. [The victim] was there. She is the only eyewitness, other than [the defendant].

"The Court: This credibility you are attacking here, you are attacking the child's credibility . . . or her credibility?

"[Defense Counsel]: The child's credibility and then coupled—then the witness'.

"The Court: I mean, she has testified about what the child said and did on the evening in question. She has testified about what she said and did on the evening in question. You are getting in . . . collateral issues that really don't belong in the case. What you are trying to do is try your case by some of these side possibilities, if you will, without any basis whatsoever, without laying the basis for those kinds of questions being asked. For instance, the posting of the bond, I mean, you know and I know there can be a myriad of reasons to help other family members post the bond in this instance. It doesn't mean anything. What you are trying to convey to the jury is, hey, the next morning she helps bond this guy out. She mustn't have

the record for appellate review properly and then proceeded with the cross-examination.[9] At the end of the trial, the defendant filed a motion for reconsideration

---

believed her daughter. That is exactly what the questions is—

"[Defense Counsel]: And who wouldn't think that?

"The Court: There are many reasons for it, and it is collateral.

"[Defense Counsel]: But it is one of the possible inferences—

"The Court: One of the possible motivations is not what is probable, likely and relevant. That is the key issue. . . .

"[Defense Counsel]: . . . I mean, given this same set of circumstances, and if it was our own child, I wouldn't care what level of loyalty, and I think most people wouldn't care what level of loyalty you may have for the extended family, you are not going to put your hard earned money up to bail some cousin out or nephew, or whatever he might be, after an assault like this if you believe it is true. That just doesn't ring true, human experience. I respectfully disagree with the court. . . .

"The Court: . . . I really think that is an issue that is collateral to the issue at hand. And it is not relevant for consideration by the trier. Do you wish to be heard on anything else?

"[The Prosecutor]: . . . is the court also granting my motion regarding the questions about [the department] involvement? . . .

"The Court: Are we getting into that or are we just going to drop that line of questioning because I don't want to waste a lot of time on the same kind of a ruling. I don't know what the relevance of that is."

[9] For context, the following is the transcript excerpt of the defendant's record for the bond issue:

"[Defense Counsel]: It was my intention to ask this witness whether or not she contributed $4000 the next morning to bond my client out of jail.

"The Court: Right.

"[Defense Counsel]: It is my understanding that the court is disallowing me from asking that. And the purpose of my question is to impeach [the] testimony [of the victim's mother] in which she said that [the victim] said that [the defendant] hurt her. I believe that the subsequent activity, helping to bond out the alleged assailant of her child, is inconsistent to the point of showing that what she said on the [witness] stand here is not true, that there was only one allegation, not an alternative in her mind that, first, that the child said she hurt herself and then she said that [the defendant] hurt [the victim]. I believe that if I were allowed to put that before the jury, they could draw the conclusion that . . . what she said on the [witness] stand is not true, that there were two different allegations here, two different assertions. That would be the purpose.

"[The Prosecutor]: And I will indicate for the record, we spent probably over an hour discussing the exhibit entry in chambers. The state's argument was that simply because she bonded out her nephew . . . would not logically mean that the victim had made any kind of statement in the bedroom

regarding both of the issues that were excluded from the testimony. The court, for the reasons it stated during trial, denied both motions.

We set forth the legal principles that guide our resolution of this issue. "We traditionally apply a two part analysis to determine whether a party has been deprived of effective cross-examination. First, we determine whether the defendant received the minimum opportunity for cross-examination of adverse witnesses required by the constitution. . . . If so, we then consider whether the trial court's restriction of cross-examination amounted to an abuse of discretion under the rules of evidence. . . . [T]he sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . . This right, however, is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. . . . The

[that] she had hurt herself. If it does anything, it would show perhaps that she did not believe her daughter's allegation, and the state's argument, quite simply, is that whatever she believes about her daughter's allegation is not relevant to this case. That is for the jury to decide.

"The Court: What about that position?

"[Defense Counsel]: My question doesn't go to her belief. My question goes to show that her responses to my questions were inaccurate because of her subsequent behavior. And I asked her, didn't she first say that she hurt herself and then [she] said [the defendant]. She said no. It is my contention that, showing that she was willing to contribute $4000 the next morning, undermines the credibility of her response to my questions. It doesn't have anything to do with believability.

"The Court: I think you are wrong. I think you are making a highly speculative leap there. And I think the purpose of your inquiry is to lead the trier of fact to draw an inference that, in fact, an alternative thing was said by the complainant in the case. It doesn't necessarily go directly to credibility of [the victim's mother]. I also think you are into speculation as to why she did what she did a day later. For those two reasons, I am not going to allow that in. I appreciate the fact that you made a record for whatever reason you think appropriate."

trial court, in its discretion, may impose limitations on the scope of cross-examination, as long as the defendant has been permitted sufficient cross-examination to satisfy constitutional requirements. . . . The confrontation clause does not . . . suspend the rules of evidence to give the defendant the right to engage in unrestricted cross-examination." (Internal quotation marks omitted.) *State* v. *Saucier*, 90 Conn. App. 132, 136–37, 876 A.2d 572 (2005), aff'd, 283 Conn. 207, 926 A.2d 633 (2007).

"The first question, therefore, is whether the defendant's cross-examination of the victim satisfied the constitutional standards required by the sixth amendment. . . . The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . . [W]e consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Citations omitted; internal quotation marks omitted.) Id. Put another way, our threshold inquiry is whether this constitutional standard has been met. See *State* v. *Laccone*, 37 Conn. App. 21, 31, 654 A.2d 805 (1995), appeal dismissed, 235 Conn. 746, 669 A.2d 1213 (1997).

Next, "[i]f we conclude that the court improperly restricted the defendant's opportunity to impeach a witness for motive, interest, bias or prejudice, we then proceed with a harmless error analysis. . . . Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting

the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (Citation omitted; internal quotation marks omitted.) *State* v. *Hedge*, 93 Conn. App. 693, 698–99, 890 A.2d 612, cert. denied, 277 Conn. 930, 896 A.2d 102 (2006).

## A

Accordingly, we must first determine whether the court's ruling to exclude matters regarding the department's investigation of the victim's mother and the decision of the victim's mother to contribute $4000 toward the posting of the defendant's bond one day after his arrest violated the defendant's sixth amendment right to confrontation. We conclude that the ruling did result in a violation of the defendant's sixth amendment right to confrontation.

"The primary interest secured by confrontation is the right to cross-examination . . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted. . . . In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Citations omitted; internal quotation marks omitted.) *State* v. *Arline*, 223 Conn. 52, 60, 612 A.2d 755 (1992). "Although it is axiomatic that the scope of cross-examination generally rests within the discretion of the trial court, [t]he denial of all meaningful cross-examination into a legitimate area of inquiry fails to comport with constitutional standards under the confrontation

clause." (Internal quotation marks omitted.) *State* v. *Santiago*, 224 Conn. 325, 331–32, 618 A.2d 32 (1992).

The constitutional standard has not been met in this case because the defendant was denied meaningful cross-examination of the victim's mother that would have elicited facts tending to show motive. "[E]vidence tending to show motive, bias or interest of an important witness is never collateral or irrelevant. [Indeed, it] may be . . . the very key to an intelligent appraisal of the testimony of the [witness]." (Internal quotation marks omitted.) *State* v. *Hedge*, supra, 93 Conn. App. 699; see also Conn. Code Evid. § 6-5. Restricting the defendant from cross-examining the mother regarding her fear of the department, her contribution of $4000 toward the defendant's bond and the failure of the defendant's father to reimburse her for the contribution eliminated jury consideration of a possible motive for her to lie about the cause of her daughter's injury.

In addition to showing the motive of the witness, these issues may have illuminated the flaws in the testimony of the victim's mother and impeached her credibility. "It is fundamental that for the purpose of impeaching the credibility of his testimony, a witness may be cross-examined as to statements made out of court . . . which contradict those made upon direct examination. . . . This is based on the notion that talking one way on the [witness] stand, and another way previously, raises a doubt as to the truthfulness of both statements." (Internal quotation marks omitted.) *State* v. *Schiavo*, 93 Conn. App. 290, 306–307, 888 A.2d 1115, cert. denied, 277 Conn. 923, 895 A.2d 797 (2006). The mother was a key prosecution witness, and she was not only the minor victim's mother but also the first person the victim went to after the alleged assault. The defendant offered proof, outside the presence of the jury, of out-of-court statements made by the mother that were inconsistent with her statements made during

direct examination. Specifically, the defendant claimed that the mother told family members that the victim had first told her that the victim had injured herself. In addition, the mother's fear of the department prevented her from telling the authorities these facts. Furthermore, the defendant claimed that the mother's contribution to his bond was inconsistent with her testimony that he sexually assaulted her daughter and consistent with her daughter's having injured herself. Because the defendant was not permitted to cross-examine the mother on those issues, the jury was unable to make a proper determination of her credibility.

The court's denial of the cross-examination of the victim's mother regarding both of these matters pertained not only to the witness' motive but also to her very credibility. Because cross-examination is so important to elucidate the flaws in a witness' testimony, the court improperly ruled that the two excluded matters were collateral and irrelevant. That ruling resulted in a violation of the defendant's sixth amendment right to confrontation because it damaged the overall quality of his cross-examination of the mother.

B

In accordance with *State* v. *Hedge,* supra, 93 Conn. App. 698–99, we next must consider whether the court's improper ruling harmed the defendant. "The correct inquiry for identifying harmless constitutional error is to ask whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Boyd,* 89 Conn. App. 1, 14, 872 A.2d 477, cert. denied, 275 Conn. 921, 883 A.2d 1247 (2005).

For a number of reasons we find that the court's rulings were harmful to the defendant. First, the testimony of the victim's mother was important in the prosecution's case because she was the first person to receive

a report of the victim's injury. Second, although other witnesses, such as a police officer and a physician, testified as to the victim's report of injury, the mother had a much closer relationship with the victim. In light of that relationship, the testimony of the mother was particularly important and not merely cumulative. Finally, the strength of the state's case depended heavily on her credibility, but the court deprived the defendant of a significant opportunity to challenge her testimony by prohibiting questioning as to the department's investigation of her and her decision to contribute $4000 toward the posting of the defendant's bond. We therefore conclude that the court's improper preclusion of cross-examination of the mother was not harmless beyond a reasonable doubt. Accordingly, the defendant is entitled to a new trial.

II

Although our resolution of the defendant's first claim is dispositive of the appeal, we address the second claim because it is likely to arise again at his new trial. The defendant claims that the court improperly denied his motion to suppress statements that he made to police officers before the officers read him his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The defendant made the statements at issue after the victim sustained her injury and went to a hospital with her mother. The physician who examined the victim notified the police that the victim could have been sexually assaulted, and an officer and a lieutenant then were dispatched to the hospital in order to investigate. The lieutenant subsequently requested that two other officers go to the defendant's home, but those officers did not know that the defendant was a suspect in a sexual assault. They asked him why they had been sent to his home, and he responded that the victim's mother had accused him of injuring the victim. The officers then waited for further instructions, and the

defendant chose to wait with them outside his home. Approximately forty-five minutes later, the lieutenant arrived at the defendant's home and arrested him. The defendant argues that the court should have granted his motion to suppress the statements that he made to the officers who first arrived at his home because he was effectively in custody at that time. We disagree.

"Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . [A]lthough the circumstances of each case must certainly influence a determination of whether a suspect is in custody for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. . . . A person is in custody only if, in view of all the surrounding circumstances, a reasonable person would have believed [that] he was not free to leave. . . . Thus, in determining whether *Miranda* rights are required, the only relevant inquiry is whether a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest. . . .

"The defendant bears the burden of proving that he was in custody for *Miranda* purposes. . . . Two discrete inquiries are essential to determine custody: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. . . . The first inquiry is factual, and we will not overturn the trial court's determination of the historical circumstances surrounding the defendant's interrogation unless it is clearly erroneous. . . . The second inquiry, however, calls for application of the controlling legal

standard to the historical facts. . . . The ultimate determination of whether a defendant was subjected to a custodial interrogation, therefore, presents a mixed question of law and fact, over which our review is de novo." (Internal quotation marks omitted.) *State* v. *Kirby*, 280 Conn. 361, 393–94, 908 A.2d 506 (2006).

Examining the circumstances of the present case, we conclude that the defendant was not in police custody when he spoke to the officers who first arrived at his home. The defendant voluntarily answered those officers' questions, and they did not restrain his freedom of movement to the degree associated with a formal arrest. He chose to wait outside his home with them while they waited for further instructions from the lieutenant. It was not until forty-five minutes after the officers arrived at the defendant's home that the lieutenant arrived and arrested him. A reasonable person in the defendant's position would not have believed that he was in police custody until the lieutenant arrested him. Accordingly, the court properly denied the defendant's motion to suppress.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.