******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DEMETRIOS KEHAYIAS
(AC 35958)

DiPentima, C. J., and Gruendel and Beach, Js.*

*Argued September 15, 2015—officially released January 12, 2016*

(Appeal from Superior Court, judicial district of
Tolland, Mullarkey, J.)

*Norman A. Pattis*, with whom, on the brief, was *Brittany B. Paz*, for the appellant (defendant).

*Emily Graner Sexton*, special deputy assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Charles W. Johnson*, assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Demetrios Kehayias, appeals from the judgments of conviction, rendered after a bench trial, of one count each of disorderly conduct in violation of General Statutes § 53a-182; risk of injury to a child in violation of General Statutes § 53-21; criminal violation of a protective order in violation of General Statutes § 53a-223; and reckless endangerment in the first degree in violation of General Statutes § 53a-63. The defendant contends on appeal that (1) the evidence was insufficient to convict him of the last three charges; and (2) the trial court improperly excluded evidence probative of the complaining witness' motive to fabricate, thereby infringing the defendant's sixth amendment right to present a defense. We affirm the judgments.

On February 26, 2011, the defendant was arrested and charged with disorderly conduct in violation of § 53a-182. On July 21, 2011, he was arrested again and was charged with risk of injury to a child in violation of § 53-21; criminal violation of a protective order in violation of § 53a-223; and reckless endangerment in the second degree in violation of General Statutes § 53a-64. Thereafter, the state filed two long form informations. The first information charged the defendant with disorderly conduct in violation of § 53a-182 (a) (1); and the second information charged him with risk of injury to a child in violation of § 53a-21 (a) (1), criminal violation of a protective order in violation of § 53a-223 (a), and reckless endangerment in the first degree in violation of § 53a-63 (a). The defendant pleaded not guilty to all four counts, which then were consolidated for trial. The defendant waived his right to a jury trial and chose instead to be tried by the court. The defendant was convicted on all four counts and sentenced to twenty-five months imprisonment with ninety-five months special parole. This appeal followed.

The record reveals the following facts. In early 2011, the defendant was in a legal dispute with the victim, K, over visitation and custody rights as to their one year old son, L.[1] At the time, K had full custody of L, and the defendant was allowed two hours of supervised visitation with him in the home of the defendant's parents on weekend days. K would deliver L to the defendant at 2 o'clock in the afternoon and then return to retrieve him at 4 o'clock.

On February 26, 2011, when K returned to pick up L, she parked her car in the driveway of the home of the defendant's parents, walked up to the door, and knocked. The defendant came to the door, carrying L. Instead of handing L to K, which K described as their typical practice, the defendant walked right past K's outstretched arms toward her car. K followed him to the rear passenger side, where she kept a car seat for L.

K again extended her arms to take L, but the defendant refused; he said that he wanted to put L in the car seat because L was sleeping. K responded, "[J]ust give him to me." The defendant pushed L toward K and said, "Here, you f'ing c-u-n-t . . . ." The defendant started walking away and calling K various names. K said to him that he should not talk to her like that in front of L. The defendant turned back around so that he faced K again, swore, and displayed his middle finger. He also put out his hand with his thumb up and his index finger extended toward K, mimicking a handgun, and said, "[b]oom, one of these days . . . ." L remained in K's arms throughout this exchange.

As the defendant began walking away again, the defendant's mother came to the door. K yelled to her that the defendant should not call K names in front of L. K then secured L in his car seat. As she did so, the defendant pulled out his cell phone and said into it, "South Windsor Police Department, please." K heard this, and as she was backing out of the driveway, the defendant repeatedly mouthed the word "boom" at her while making the gun hand gesture. K recorded much of the incident on a small digital device. It was this incident that gave rise to the disorderly conduct charge.

On July 21, 2011, K was driving her mother, M, and L to pick up K's nephew from a summer program in Manchester. It was a sunny, clear day. The trio rode in M's car, the windows of which were not tinted, so as to permit an observer to see through them and identify the passengers. K merged onto Interstate 84 and was driving in the far right lane.

Suddenly, a Jeep came "out of nowhere in front of" K and "slam[med] on his brake." K tried to apply her brakes to avoid colliding with the Jeep but realized that she did not have enough time to come to a full stop. Accordingly, she swerved off of the road onto the shoulder to avoid impact. K observed that the car was a Jeep Wrangler with the ability to become a convertible, which the defendant possessed at the time of the incident. K and M saw immediately that the defendant was the driver. The defendant was wearing a baseball cap and sunglasses, as was his habit. The defendant extended his middle finger at K and M and then sped off. After stopping at the roadside, K immediately got out to tend to L, who had vomited on himself during the incident and was crying.

Shortly after the July 21, 2011 incident occurred, K made a criminal complaint at the state police troop C barracks. After she did so, the state trooper with whom she spoke, Trooper Jamie Sanders, called the defendant to ask him to come in for questioning. He did so that same day, accompanied by his lawyer. He arrived in a Jeep Wrangler, and he was wearing a Boston Red Sox baseball cap. The defendant admitted to Trooper Sanders that he had been on Interstate 84, going in the same

direction as K, earlier in the day. The defendant also admitted that he had pulled in front of a vehicle and braked, but claimed that he did not know who it was. As a result of this incident, the defendant was charged with risk of injury to a child, criminal violation of a protective order and reckless endangerment in the first degree.

I

The defendant first claims that there was insufficient evidence to convict him of any of the three counts alleged in connection with the July 21, 2011 highway incident[2] because (1) K's and M's ability to identify the driver of the Jeep was impaired by his hat and sunglasses, by the high stress level that the incident induced, and by K's motive to testify falsely, and (2) no evidence adduced by the state indicated that the defendant knew K's and L's whereabouts such that he could have acted with the general intent required to violate the protective order. We are not persuaded.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [fact finder] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the [fact finder's] verdict. . . .

"While the [fact finder] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the [fact finder] to conclude that a basic fact or an inferred fact is true, the [fact finder] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [fact finder's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Michael H.*, 291 Conn. 754, 759, 970 A.2d 113 (2009). "[T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the rele-

vant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Morgan*, 274 Conn. 790, 801, 877 A.2d 739 (2005).

The fact that the state's case against a defendant turns upon the credibility of witnesses does not make it insufficient to support a conviction. See *State* v. *Osoria*, 86 Conn. App. 507, 514, 861 A.2d 1207 (2004) ("[t]he defendant's challenge to the sufficiency of the evidence is primarily a challenge to the credibility of [a certain witness'] testimony, which provided a sufficient evidentiary basis for the conviction"), cert. denied, 273 Conn. 910, 870 A.2d 1082 (2005). Responding to the defendant's allegation that a key state's witness was not credible in part because he testified against the defendant under a plea bargain, the court in *Osoria* demurred: "Questions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . Our review of factual determinations is limited to whether those findings are clearly erroneous. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude. . . . The arguments raised by the defendant on appeal with regard to [the witness'] credibility are arguments that the defendant properly raised at trial before the jury; they were fodder for the [fact finder's] consideration in determining what weight to afford [the witness'] credibility, but are not the proper subject of an appeal." (Citation omitted; internal quotation marks omitted.) Id., 514–15. Furthermore, "because the [fact finder] has the opportunity to observe the conduct, demeanor and attitude of the witnesses and to gauge their credibility, [i]t is axiomatic that evidentiary inconsistencies are for the [fact finder] to resolve, and it is within the province of the [fact finder] to believe all or only part of a witness' testimony." (Internal quotation marks omitted.) *State* v. *Morgan*, supra, 274 Conn. 800.

The evidentiary strand common to the defendant's conviction of each of the three charges arising from the highway incident of July 21, 2011, was the identity of the driver of the Jeep. The thrust of the defendant's insufficiency claim is that this strand was lacking and that its absence rendered the state's case against him threadbare.[3] "It is black letter law that in any criminal prosecution, the state bears the burden of proving beyond a reasonable doubt the defendant's identity as one of the perpetrators of the crime charged." (Internal quotation marks omitted.) *State* v. *Fleming*, 111 Conn. App. 337, 343, 958 A.2d 1271 (2008), cert. denied, 290 Conn. 903, 962 A.2d 794 (2009).

Identity may be proven through the testimony of eyewitnesses even if that is the only evidence of it. See, e.g., id., 344; *State* v. *Morgan*, supra, 274 Conn. 802; *State* v. *Rivera*, 74 Conn. App. 129, 138, 810 A.2d 824 (2002); *State* v. *Smith*, 57 Conn. App. 290, 298–99, 748 A.2d 883, cert. denied, 253 Conn. 916, 754 A.2d 164 (2000). Moreover, "[t]he trier of fact determines with finality the credibility of witnesses and the weight to be accorded their testimony. . . . Any part of a witness' testimony may be believed or disbelieved by the trier of fact. . . . This court does not retry the case or evaluate the credibility of the witnesses." (Citations omitted; internal quotation marks omitted.) *State* v. *Gainer*, 51 Conn. App. 563, 575–76, 724 A.2d 521 (1999).

In this case, the evidence was sufficient to prove that the defendant was the person who committed the crimes of July 21, 2011. The court heard the testimony of K and M that they recognized the defendant immediately after he drove in front of them and braked. Indeed, the testimony of K, M, and the defendant made clear that K and M had known the defendant well for several years because K and the defendant had been involved romantically. K testified that the Jeep was "[l]ess than a car length" away from her when both cars stopped. She further testified that she saw the defendant's face in profile and recognized him immediately, notwithstanding his hat and sunglasses; in fact, she testified that the defendant invariably wore such hats. M made corresponding observations. The court also had in evidence the testimony of Trooper Sanders, who noted that when the defendant arrived at the state police barracks shortly after the highway incident, he was wearing a Boston Red Sox baseball cap that matched K's description. Trooper Sanders also testified that the defendant had admitted to him that he had cut off and braked in front of a car on the highway, although he claimed not to have known whose car it was.

The court made clear that its findings and the resulting finding of guilt rested on the credibility of the principal witnesses. Specifically, the court found K "to be very credible, while admittedly she has a strong interest in the custody of her son." By contrast, the court "did not find [the defendant] credible either in his demeanor, [or] in his facts . . . ." "We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Osoria*, supra, 86 Conn. App. 515.

Construing the evidence in the light most favorable to the court's finding of guilt; see *State* v. *Morgan*, supra, 274 Conn. 801; the evidence was sufficient to prove that K and the defendant had known each other for a long period of time, that the defendant purposefully maneuvered his vehicle in front of hers at highway speeds

and braked, causing her car to come to an abrupt stop and to swerve off of the main roadway, and that both K and M properly identified the defendant as the perpetrator of these acts, and, therefore, that the defendant was the person who committed the crimes charged.

The defendant's attempts to discredit K's and M's testimony are unavailing at this juncture. Using the *Wade* factors for measuring the reliability of eyewitness identifications; see *United States* v. *Wade*, 388 U.S. 218, 228, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967); the defendant argues that K did not have an adequate opportunity to observe the driver of the Jeep because he was wearing a hat and sunglasses; and also that she was under a high level of stress, which impaired her ability to make an accurate identification.[4] See id. The defendant also argues that K's motive and bias against him led her to misidentify him as the driver.

"The arguments raised by the defendant on appeal with regard to [the witness'] credibility are arguments that the defendant properly raised at trial before the [fact finder]; they were fodder for the [fact finder]'s consideration in determining what weight to afford [the witness'] credibility, but are not the proper subject of an appeal." (Citations omitted; internal quotation marks omitted.) *State* v. *Osoria*, supra, 86 Conn. App. 515. All of the defendant's arguments challenge K's credibility by suggesting that she either mistook or fabricated her identification of the defendant. As *Osoria* and similar cases suggest, these arguments fall short because we cannot review, let alone overturn, the court's credibility judgments.[5]

## II

The defendant next claims that the court improperly curtailed his impeachment of K for motive to fabricate and bias against him by (1) preventing him from cross-examining her about family court proceedings concerning his visitation rights as to L; and (2) excluding from evidence a videotape showing part of a visit with and custody exchange of L in the defendant's home, each in violation of the sixth amendment right to present a defense. We disagree.

## A

We turn first to the defendant's claim that the court violated his sixth amendment right to present a defense by refusing to allow him to ask a question on cross-examination about what transpired on a certain date in family court. We reject the defendant's claim.

Before delving into the law that guides our analysis, we set forth our standard of review.[6] "The court's discretion [to exclude evidence], however, comes into play only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment [to the United States constitution]. . . . The sixth amendment . . . guarantees the right of an accused in

a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . . As an appropriate and potentially vital function of cross-examination, exposure of a witness' motive, interest, bias or prejudice may not be unduly restricted. . . . Compliance with the constitutionally guaranteed right to cross-examination requires that the defendant be allowed to present the jury with facts from which it could appropriately draw inferences relating to the witness' reliability. . . . [P]reclusion of sufficient inquiry into a particular matter tending to show motive, bias and interest may result in a violation of the constitutional requirements of the sixth amendment. . . . In determining whether such a violation occurred, [w]e consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Hedge*, 93 Conn. App. 693, 697–98, 890 A.2d 612, cert. denied, 277 Conn. 930, 896 A.2d 102 (2006).

"The . . . question, therefore, is whether the defendant's cross-examination of the victim satisfied the constitutional standards required by the sixth amendment. . . . The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . . [W]e consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial. . . . Put another way, our threshold inquiry is whether this constitutional standard has been met. . . .

"Next, [i]f we conclude that the court improperly restricted the defendant's opportunity to impeach a witness for motive, interest, bias or prejudice, we then proceed with a harmless error analysis. . . . Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Fernando R.*, 103 Conn. App. 808, 819–20, 930 A.2d 78, cert. denied, 284 Conn. 936, 937 A.2d 695 (2007).

Finally, we note that "[a]lthough only relevant evidence may be elicited through cross-examination . . .

[e]vidence tending to show motive, bias or interest of an important witness is never collateral or irrelevant. [Indeed, it] may be . . . the very key to an intelligent appraisal of the testimony of the [witness]. . . . Accordingly, cross-examination to elicit facts tending to show that a witness' testimony was motivated by bias may not be unduly restricted." (Citations omitted; internal quotation marks omitted.) *State* v. *Christian*, 267 Conn. 710, 748, 841 A.2d 1158 (2004).

The following additional facts are relevant to the disposition of these claims. On cross-examination, K testified that L had been given her last name rather than the defendant's, that she had not originally claimed the defendant to be L's father, that she had "never asked [for] or wanted" child support payments from the defendant, that she deliberately did not tell the defendant that L had been born, that she had not intended that he ever find out about L's birth, that she did not want the defendant around her or her son because the defendant had threatened them, that she suggested to him that she would not name him as the father and ask for child support in exchange for his leaving her and L alone, that she had filed for a civil restraining order against the defendant, that she told the family court that she did not want the defendant to have any visitation time with L, that she wanted the defendant not to have any contact with her or L, and that her new husband wanted to adopt L.

After this testimony, defense counsel asked K the question that precipitated the defendant's sixth amendment claim:

"[Defense Counsel]: Okay. All right. And now what happened, if you remember, on March 14, 2011, when you went back into family court; what happened to [the defendant] and his visitation with [L]?

"[The Prosecutor]: Objection. Relevance.

"[Defense Counsel]: I'm claiming it.

"[The Prosecutor]: Why are we worried about what happened on March 14? Nothing [is] alleged to have happened that day. Doesn't go to an element of the crime.

"[Defense Counsel]: I'm claiming it, Your Honor. Because, as the defendant will testify, certain things did happen as a direct consequence.

"[The Prosecutor]: Is he claiming that this witness had control over what happened at the court date on March 14?

"[Defense Counsel]: Yes.

"The Court: Sustained.

"[Defense Counsel]: Sustained . . . . His visitation with [L] was essentially terminated; wasn't it as a result of this arrest?

"[The Prosecutor]: Objection. Same ground. Same question in a different form.

"[Defense Counsel]: Motive, Your Honor.

"[The Prosecutor]: This witness didn't control what happened.

"The Court: Not the question. You can ask her about her motive. You can't ask her about [the family court judge's] philosophy.

"[Defense Counsel]: No, I didn't, Your Honor. I didn't ask her to—

"The Court: Sure, you did.

"[Defense Counsel]: When he went to court on—

"The Court: What went into [the family court judge's] mind to make whatever decision he made.

"[Defense Counsel]: No.

"The Court: No?

"[Defense Counsel]: I didn't ask to explain [the family court judge's]—

"The Court: Well, she can't terminate the visitation. Only one of us can terminate the visitation.

"[Defense Counsel]: Yes, Your Honor."

As an initial matter, we note that the confusion in this colloquy obscured the fact that the question did seek relevant evidence. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1. As our Supreme Court observed, "[e]vidence tending to show motive, bias or interest of an important witness is never collateral or irrelevant." (Internal quotation marks omitted.) *State* v. *Christian*, supra, 267 Conn. 748. Although defense counsel, perhaps mistakenly, initially agreed that he was asserting that K had control over happenings in family court, defense counsel shortly afterward made clear that his question was directed to K's motive to manufacture the defendant's prosecution to wrest his parental rights from him. Defense counsel's question about what happened on a family court date shortly after the first of the two events for which the defendant was being prosecuted could have revealed a nexus between the criminal and family cases. This nexus could in turn have suggested, albeit circumstantially, that it was K's design to fabricate or exaggerate recent events to obtain a favorable result in the family court proceedings.

The question then becomes whether the court properly excluded the testimony, notwithstanding its relevance as evidence of bias. The threshold inquiry is whether the court's restriction on the defendant's cross-

examination of K regarding her motive in the case violated the defendant's sixth amendment right of confrontation. See *State* v. *Fernando R.*, supra, 103 Conn. App. 819–20. "The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. . . . [W]e consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Internal quotation marks omitted.) Id., 819.

In so inquiring, reviewing courts have declined to hold that a defendant's confrontation right was violated by limits on cross-examination when the defendant was allowed to ask other questions about the same motive, bias, or interest. In *State* v. *Lubesky*, 195 Conn. 475, 481–82, 488 A.2d 1239 (1985), our Supreme Court acknowledged that although it was "proper"; id., 482; for the defendant to have asked a crucial state's witness regarding his hope for leniency in pending prosecutions in exchange for his testimony, the exclusion of a single question on the subject after the witness had already admitted that there were charges pending against him and that he hoped for leniency in exchange for his testimony did not violate the defendant's right of confrontation. Id., 482–83. Similarly, in *State* v. *Wilson*, 188 Conn. 715, 721, 453 A.2d 765 (1982), the court concluded that although an excluded question asking how many felony charges were pending against the witness codefendant should have been allowed, the defendant's right of confrontation was not violated because he was allowed to ask questions probing not only the witness' own involvement in the crime, but also the fact that he was then incarcerated, was a codefendant, had other criminal cases pending, and stood to receive leniency in the pending case because he was testifying against the defendant. Id. In *State* v. *Hackett*, 182 Conn. 511, 519–20, 438 A.2d 726 (1980), our Supreme Court concluded that the trial court had not erred in excluding a single question asking an accomplice who had agreed to testify for the state whether his attorney had begun plea negotiations with the state before the date of his plea agreement, which was in evidence. Id. The court noted that the defendant had not only put the witness' plea bargain into evidence, but also had cross-examined him extensively on his hope for leniency or immunity in the disposition of his own case. Id. The court concluded: "Looking at the record as a whole, we cannot find error in the failure to allow the disputed question to be asked. One adverse ruling in more than 200 pages of extensive cross-examination is not an undue restriction of legitimate inquiry into bias, interest, motive, or expectation of leniency." Id., 520.

*State* v. *Milum*, 197 Conn. 602, 500 A.2d 555 (1985), demarcates the constitutional boundary between permissible and impermissible limits on cross-examination for bias, motive, or interest. In *Milum*, our Supreme Court found error where the trial court refused to allow the defendant to ask the victim *at all* about either the victim's pending civil suit arising from the same events against the defendant, or about the victim's demand for $25,000 in exchange for her recommendation of a suspended sentence for the defendant. Id., 607–608. The court did not characterize the trial court's ruling as a mere, permissible limit on cross-examination, but rather as an impermissible "denial" of it because a potential source of bias remained wholly hidden from the jury. See id., 614.

Because the court in the present case merely limited, and did not preclude, inquiry into a specific motive that already had been robustly developed on cross-examination, the defendant's right of confrontation was not violated. As in *Lubesky*, *Wilson*, and *Hackett*, the defendant extensively cross-examined the witness about her specific interest in the outcome of the criminal case—namely, to use that case for the purpose of excising the defendant from her child's life. Defense counsel successfully got her to admit on the witness stand that she had given her son her own last name, that she had not only declined to name the defendant as her son's father but had made no attempt to inform him—and indeed had never intended that he learn—of the child's birth, that she had never demanded child support payments from the defendant and had even offered that she would promise never to do so in exchange for his promise to leave her and her son alone, that she wanted the defendant never to have any contact with her or her son and had filed for a civil restraining order to that end, and even that her new husband wanted to adopt her son. Unlike in *Milum*, K's interest in the outcome was not completely concealed from the fact finder by a total bar on cross-examination on the subject. Indeed, the court specifically acknowledged in its findings that it had considered the issue, noting that "quite frankly, [it] found [K] to be very credible, while admittedly she has a strong interest in the custody of her son."

The defendant cites *State* v. *Baltas*, 311 Conn. 786, 91 A.3d 384 (2014), in support of his argument that the court's limit on cross-examination of K violated his right of confrontation. But *Baltas* reinforces, rather than disrupts, the pattern described previously. In *Baltas*, the court excluded cross-examination of a complaining witness on the subject of her rocky relationship with her stepfather, one of the victims of the crimes at issue in *Baltas*. See id., 794–95. The court also excluded external evidence, which would have been introduced through another witness, of the fact that the complaining wit-

ness' father had recently received a large sum of money that the complaining witness and the defendant mutually wanted to acquire. Id., 796. No other such evidence was apparently allowed. Our Supreme Court therefore determined that as in *Milum* and unlike in *Lubesky*, *Wilson*, and *Hackett*, the trial court completely precluded an inquiry into motive rather than merely confining it to constitutionally allowable dimensions. Id., 804. This case, however, is one of confinement and not of preclusion. As we discussed previously, the defendant was allowed to cross-examine K at length about her substantial interest in the outcome of the case. The confrontation clause does not require more; the court's ruling did not violate the defendant's right of confrontation.

B

We turn next to the defendant's claim that the court violated his sixth amendment right to present a defense by excluding from evidence a certain video recording, which, in the defendant's estimation, would have impeached K's testimony. We reject this claim.

The following additional facts and procedural history are relevant. Testifying about the routine that she and the defendant followed at the end of visits between L and the defendant, K said that "typically," she would drive into the defendant's driveway, get out of her car, walk up to the door, and knock, at which point the defendant would come to the door carrying L and hand him to K. K then contrasted this routine with the events of February 26, 2011.

Responding to K's account of a typical custody exchange, the defendant proposed to offer into evidence a videotape that was taken about two weeks before February 26, 2011, and that showed part of a visit between L, K, and the defendant in the defendant's home. The defendant argued that the videotape impeached K's testimony because it showed them together in the house with L and because it showed the defendant carrying L out to the car. The defendant argued that these depictions were inconsistent with K's account of prior custody exchanges. The prosecutor objected on the grounds that K had not been confronted with the video while on the witness stand and that the video was irrelevant. The trial court sustained the objection, finding the video irrelevant because it did not impeach K's testimony that the baby was "typically" passed from the defendant to K at the door at the end of visits. In so ruling, the court pointed out that K had said "typically" rather than "universally," presumably meaning that the video was not necessarily inconsistent with her testimony.

The law regarding impeachment by extrinsic evidence largely mirrors that of impeachment by cross-examination, which we discussed previously.

"Impeachment of a witness for motive, bias and interest may also be accomplished by the introduction of extrinsic evidence. . . . The same rule that applies to the right to cross-examine applies with respect to extrinsic evidence to show motive, bias and interest . . . ." (Internal quotation marks omitted.) *State* v. *Ferguson*, 260 Conn. 339, 350–51, 796 A.2d 1118 (2002).

"The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion." *State* v. *Barnes*, 232 Conn. 740, 746–47, 657 A.2d 611 (1995). Furthermore, "[t]o establish an abuse of discretion, [the defendant] must show that the restrictions imposed upon [the] cross-examination were clearly prejudicial." (Internal quotation marks omitted.) *State* v. *Castro*, 196 Conn. 421, 426, 493 A.2d 223 (1985). "The proffering party bears the burden of establishing the relevance of the offered testimony. Unless such a proper foundation is established, the evidence . . . is irrelevant." (Internal quotation marks omitted.) *State* v. *Barnes*, supra, 747. "When the trial court excludes defense evidence that provides the defendant with a basis for cross-examination of the state's witnesses, however, such exclusion may give rise to a claim of denial of the right to confrontation and to present a defense." *State* v. *Casanova*, 255 Conn. 581, 592, 767 A.2d 1189 (2001).

The defendant's claim that the court's ruling to exclude his proffered evidence violated his right of confrontation presupposes that the evidence was relevant to impeach K for motive, bias, or interest. But even if we assume, without deciding, that the evidence was relevant for this purpose, the defendant's right of confrontation was not violated for substantially the same reasons recited previously regarding the court's exclusion of a single question on cross-examination.[7] The court made an isolated "adverse ruling" that excluded a single piece of evidence whose relevance to impeach was dubious at best, and whose exclusion did not violate the defendant's right of confrontation. The defendant questioned K at grueling length and in excruciating detail about her interest in the outcome of the case— the custody of her child. K made no attempt whatsoever to conceal this interest; rather, she readily and plainly admitted it at every turn. It certainly was not wholly excluded from the fact finder's consideration: as noted previously, the court in its findings explicitly acknowledged K's bias. The defendant was given ample opportunity to exhibit K's bias, and he took full advantage of that opportunity. His sixth amendment right of confrontation accordingly was not violated.

The judgments are affirmed.

In this opinion the other judges concurred.

* This appeal originally was heard before a panel of this court consisting of Judge Gruendel, Judge Beach and Justice Borden. Thereafter, Chief Judge DiPentima replaced Justice Borden. Chief Judge DiPentima has read the record and briefs, and listened to the recording of oral argument, prior to participating in this decision.

[1] In accordance with our policy of protecting the privacy interests of the victims of the crimes of risk of injury to a child and criminal violation of a protective order, we decline to identify the victims or others through whom the victims' identities may be ascertained.

[2] The defendant does not specifically challenge the sufficiency of the evidence to support his conviction of disorderly conduct; thus, we do not consider it here.

[3] The defendant also argues that the evidence was insufficient to prove beyond a reasonable doubt that he acted with the general intent required to violate the protective order, but his argument, although framed in terms of general intent, amounts to a circumstantial case that the defendant was not present—in other words, identity.

[4] The defendant did not and does not argue that the identifications were constitutionally or statutorily inadmissible; see *United States* v. *Wade*, supra, 388 U.S. 228; *State* v. *Outing*, 298 Conn. 34, 47–48, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011); General Statutes § 54-1p.

[5] The defendant suggested at oral argument before this court that certain language in *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 268, 112 A.3d 1 (2015), might have modified the role of reviewing courts with respect to credibility determinations by lower courts in some circumstances. The defendant admitted, however, that the issue had not been briefed for argument, and we will not address it here.

[6] We discuss only the standard of review for claims of constitutional error because the defendant has not raised or briefed the issue of whether the court committed nonconstitutional, evidentiary error by excluding the cross-examination questions.

[7] We refer here to our previous, analogous discussion of what constitutes undue restriction of the right of cross-examination. See *State* v. *Hackett*, supra, 182 Conn. 520.